| | |
|---|---|
| **2nd Judicial District Court** <br> **City and County of Denver, State of Colorado** <br><br> Court Address:   1437 Bannock Street <br> Denver, CO 80202 | DATE FILED: May 20, 2021 3:21 PM <br> FILING ID: 9FD1CC379ADEC <br> CASE NUMBER: 2021CV31601 |
| **Plaintiff:**   The Calvary Baptist Church of Denver <br><br> **v** <br><br> **Defendants:** Church Mutual Insurance Company; and Church Mutual Insurance Company, S.I. | ▲   COURT USE ONLY   ▲ |
| **Attorneys for Plaintiff:** <br> Attorney:   Jennifer A. Milne, #46286 <br>            David M. Roth, #44800 <br> Address:   Roth Milne <br>            950 South Cherry St., Suite 416 <br>            Denver, CO 80246 <br> Phone Num.:  (303) 662-8082 <br> FAX Num.:    (303) 662-8083 <br> E-Mail:     jennifer@randmlaw.com <br>            david@randmlaw.com | Case Number: <br><br> Div.: |
| **COMPLAINT AND JURY DEMAND** | |

COMES NOW PLAINTIFF, The Calvary Baptist Church of Denver, by and through its attorneys, Roth Milne, and respectfully files the following Complaint against the Defendants, as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, The Calvary Baptist Church of Denver ("Plaintiff"), is a nonprofit corporation religious institution in good standing and organized under the laws of the State of Colorado.

2.     Upon information and belief, Defendant Church Mutual Insurance Company ("Church Mutual"), is an unincorporated mutual insurance company organized under the laws of Wisconsin, and is, accordingly, a citizen of all states where its members are citizens.

3.     Upon information and belief, Defendant Church Mutual Insurance Company, S.I. ("Church Mutual S.I.") is an unincorporated mutual insurance company that is a citizen of all states where its members are citizens.

1

4. Church Mutual and Church Mutual, S.I. (collectively, "Defendants") are authorized to do business in Colorado and are doing so by, among other things, underwriting and issuing the policy of insurance insuring Plaintiff's Property located in Colorado.

5. Defendants' policyholders are members of Defendants.

6. Plaintiff, as a policyholder, is a member of Defendants.

7. This Court has jurisdiction over the subject matter of this action and the parties hereto.

8. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(1).

## GENERAL ALLEGATIONS

9. Plaintiff is the owner of certain real property and improvements, including, without limitation, a building and personal property, located at 6500 E. Girard Ave., Denver, CO 80224 (the "Property").

10. Defendants underwrote and issued a policy of insurance to Plaintiff with Policy Number 0035405-02-968733 (the "Policy").

11. The Policy was in effect from January 10, 2017 to January 10, 2020, and insured the building and Property on the date of loss identified in this dispute.

12. The Policy covers, *inter alia*, all risks of direct physical loss of or damage to covered property, unless specifically contained in the Exclusions or Limitations sections of the Causes of Loss form.

13. Neither hail nor wind is contained in the Exclusions or Limitations of the applicable policy form.

14. Therefore, damage caused by wind and/or hail is a covered cause of loss under the Policy.

15. The Policy also contains coverage for the increased costs of construction required to comply with an applicable law or ordinance that was in effect on the date of loss and compliance with which was triggered by a covered loss.

16. The Policy does not contain any exclusion for "cosmetic" damage to the Property.

17. On or about June 18, 2018, a hail and windstorm struck the area surrounding and including Plaintiff's Property, causing covered damage to the Property.

18. The covered damage caused to the Property included, *inter alia*, damage to the Property's roof.

19. On or about September 14, 2018, Plaintiff hired Skyyguard to act as its general contractor.

20. On or about September 14, 2018, Plaintiff signed a Communication Authorization to permit and authorize Defendants to communicate with Skyyguard concerning "any and all information pertaining to [the] claim…"

21. Plaintiff submitted a claim to Defendants for the damage caused by the hail and windstorm and was assigned claim number 1367577 (the "Claim").

22. When it submitted the Claim to Defendants, Plaintiff specifically authorized Defendants to communicate with Skyyguard about the Claim.

23. On or about November 15, 2018, Skyyguard inspected the Property and determined that the hail and windstorm caused covered damage in the amount of at least $726,197.60.

24. Upon information and belief, Defendants first inspected the Property on or about November 15, 2018.

25. However, Defendants did not complete an estimate or pay *any* covered benefits to Plaintiff until on or about February 1, 2019, *nearly two and a half months later*.

26. On or about February 1, 2019, Defendants sent a letter to Plaintiff in which they outlined their offer to settle the Claim for a Replacement Cost Value ("RCV") of $18,115.52 and an Actual Cash Value ("ACV") of $16,676.37, ultimately sending payment in the amount of $11,676.37 on or about February 5, 2019 (which accounted for Plaintiff's $5,000.00 deductible).

27. After receiving Defendants' letter and February 1, 2019 estimate, Skyyguard attempted to contact Defendants' adjuster several times to discuss their disagreement with Defendants' evaluation.

28. Skyyguard received no response to its phone calls.

29. Defendants' February 1, 2019 estimate reflected a woefully inadequate and unreasonable investigation into the extent of the covered damage at the Property, and was an unreasonable attempt to settle the claim for an amount significantly lower than the true value of the Claim.

30. In their February 1, 2019 estimate, Defendants acknowledged covered damage to the Gravity roof ventilator, gutters, flashing/rain diverter, and minor damage to the wood fence/gate.

31. Defendants also noted in its February 1, 2019 letter that it had assigned the Claim to Commercial Insurance Services to inspect the HVAC units on the roof.

32.     Defendants provided no explanation as to why it had not assigned the Claim to anyone to inspect the HVAC units during the nearly two and a half months since it initially inspected the Property.

33.     On or about February 7, 2019, a representative of Commercial Insurance Services ("CIS") contacted Plaintiff to inform it that it had been engaged by Defendants to investigate whether Plaintiff's HVAC system had sustained any covered damage.

34.     On or about March 13, 2019, Skyyguard completed an estimate to return the Property to pre-loss condition and identified a RCV of $734,755.28, which included, among other things, fully replacing the roof of Plaintiff's Property.

35.     Having still had no response or communication from Defendants, on or about March 26, 2019, Skyygaurd emailed Defendants on Plaintiff's behalf to request a readjustment of the Claim.  Skyyguard attached Defendants' February 1, 2019 estimate and its March 13, 2019 estimate to demonstrate the differences in the identified damage and necessary repairs.

36.     That same day, Defendants sent Plaintiff a letter stating that CIS's evaluation found additional covered damage to one HVAC unit.

37.     Defendants also provided their revised estimate, which acknowledged an RCV of $30,687.22 and an ACV of $27,228.24.

38.     Defendants paid an additional $10,551.87 in covered benefits to Plaintiff.

39.     The payment of these benefits was delayed without a reasonable basis.  Defendants have provided no reasonable explanation as to why it took *more than four (4) months* to find, evaluate, and pay benefits owed to repair the hail-damaged HVAC unit.

40.     Defendants continued to fail and refuse to acknowledge the entirety of the covered damage to the HVAC units at the Property.

41.     In response to Skyyguard's request for a readjustment of Defendants' evaluation of the Claim, Defendants engaged S-E-A, Ltd ("SEA") on or about June 3, 2019, to inspect Plaintiff's roof for hail and wind damage.

42.     Upon information and belief, Defendants waited *over two (2) months* to take any action on Plaintiff's request for a reevaluation of the Claim.

43.     Upon information and belief, SEA sent an engineer to inspect Plaintiff's Property on or about June 6, 2019.

44.     On or about June 19, 2019 SEA completed a Roof Damage Evaluation report concerning its inspection of the Property.

4

45. In its evaluation report, SEA noted that weather data reported a hailstorm on or about the reported date of loss containing hail of up to 1.8 inches in diameter at or around the Property.

46. In its evaluation report, SEA concluded that the Property sustained hail damage to the fins of an air-conditioning unit; rain caps on mechanical vents; and the steel panel roof coverings over the roof slopes.

47. SEA commented that the hail damage to the rain caps and steel panel roof coverings were "cosmetic in nature."

48. SEA further stated in its report that it "cannot rule out that a single mark on the roof membrane on the parapet wall surface near the northwest corner of the elevated low-slope roof near the east elevation of the building was the result of hail. The single mark in the membrane will require repair."

49. On or about June 21, 2019, Defendants sent a letter to Plaintiff referencing SEA's evaluation report.

50. Defendants stated in the letter that, based on SEA's report, it would acknowledge and pay additional benefits to repair covered damage to the rain caps and the repair to the parapet wall.

51. At that time, Defendants increased their RCV on the Claim to $31,217.81.

52. However, the additional payment of $507.55 was not issued until nearly three (3) months later.

53. On or about August 13, 2019, Defendants sent a letter to Plaintiff, finally responding to Plaintiff's March 26, 2019 request for a reinspection and reevaluation of their adjustment of the Claim.

54. In their August 13, 2019 letter, Defendants again relied on SEA's engineering report, stating that the engineer's inspection "revealed no evidence of storm damage to the roof," directly contrary to the actual conclusions stated in the engineer's report.

55. Defendants again stated that the engineer "did document hail damage to the AC fins, Rain Caps and the parapet wall" and acknowledged additional benefits to "include the rain caps as well as the repair to the parapet wall."

56. Defendants again provided no explanation as to why the purportedly "cosmetic" damage to the rain caps was covered under the Policy, but the purportedly "cosmetic" damage to the roof did not even constitute "storm damage," let alone covered storm damage under the Policy.

57. Defendants unreasonably continued to fail and refuse to acknowledge or pay benefits to repair the covered damage to the roof, stating that this damage was denied as being "Cosmetic hail damage."

58. Plaintiff's Policy does not contain an exclusion for cosmetic damage.

59. With its August 13, 2019 letter, Defendants provided Plaintiff with the excerpt from the Policy containing the Exclusions, which demonstrated that there is no exclusion for cosmetic damage under the Policy.

60. Defendants provided no explanation, let alone a reasonable explanation, for paying benefits to repair the allegedly "cosmetic" damage to the rain caps as covered under the Policy, but not paying benefits to repair the allegedly "cosmetic" damage to the steel panel roof coverings as not covered under the Policy.

61. Because Defendants continued to unreasonably undervalue the Claim, Plaintiff engaged Steve Ziegler of Reserve Capital LLC to act as Plaintiff's appraiser pursuant to the Policy.

62. On or about September 16, 2019, Defendants issued an additional payment of benefits to Plaintiff in the amount of $507.55.

63. On or about September 26, 2019, Mr. Ziegler emailed Defendants a copy of Plaintiff's appraisal demand letter and requested that Defendants name their appraiser.

64. Having had no response from Defendants, on or about October 9, 2019, Mr. Ziegler sent a follow up email to Defendants again requesting that Defendants name their appraiser.

65. On or about October 16, 2019, Defendants acknowledged Plaintiff's appraisal demand letter and named Brett Lochridge of Dallas, Texas as their appraiser.

66. Upon information and belief, the two appraisers met and inspected the Property on November 5, 2019.

67. Both appraisers agreed that the roof had sustained hail damage and needed to be fully replaced.

68. Both appraisers agreed that the HVAC units had sustained hail damage and needed to be replaced.

69. On or about November 13, 2019, while the Claim was still pending and when Defendants had only acknowledged approximately $22,000 in covered benefits on the Claim, Defendants sent a letter to Plaintiff stating that its Policy would renew soon and that the deductible for windstorm or hail coverage would increase from $5,000 to $100,000.00 because of "Change [*sic*] underwriting guidelines."

70. The letter also notified Plaintiff that its premium would increase, but that Defendants had added a "Limitations on coverage for roof surfacing endorsement" to the Policy, meaning that roof surfacing would only be covered for ACV benefits and "cosmetic damage to roof surfacing due to wind and/or hail" would be excluded. Again, Defendants stated that these changes were due to "Change [*sic*] underwriting guidelines."

71. On or about December 9, 2019, Defendants sent a letter to Plaintiff again informing it that its Policy was in the process of being renewed, and "noting" that the deductible for wind and hail would increase to $100,000.

72. Defendants also stated in this letter that, "A separate policy is available to cover up to $95,000 of this deductible. Please contact me after your current hail claim is closed if you would like a quotation for this coverage (the company will not release a quote with an open claim).

73. So, it seems that Defendants were capable of taking retaliatory measures against Plaintiff while its hail claim was pending by significantly reducing coverage while increasing Plaintiff's premium and deductible, but could not offer the coverage available to minimize the effect of this retaliation on Plaintiff until the hail claim was closed.

74. On or about December 9, 2019, Plaintiff's appraiser emailed Defendants' appraiser to ask when he will have a full estimate reflecting Defendants' appraiser's position available for review.

75. Having still not received Defendants' appraiser's estimate, Plaintiff's appraiser emailed Defendants' appraiser to follow up and again request his position estimate on or about January 6, 2020.

76. Plaintiff's appraiser followed up with Defendants' appraiser again on January 23, 2020.

77. Defendant's appraiser did not provide a complete estimate regarding the cost to repair the hail damage that he observed at the Property until on or about February 4, 2020.

78. Upon information and belief, Defendants first issued the Policy to Plaintiff in or around 2017.

79. In early 2020, Plaintiff could not locate a full and complete copy of the Policy.

80. Accordingly, on or about February 10, 2020, Skyyguard sent an email to Defendants requesting a complete copy of the Policy that was in effect on the date of loss, and providing a copy of the September 14, 2018 Communication Authorization.

81. On or about February 12, 2020, Defendants responded to Skyyguard stating, "Attached is the policy as requested."

82. The policy provided to Skyyguard by Defendants consisted of 32 pages.

83. The policy provided to Skyyguard by Defendants included Declarations Pages identifying the limits of liability under the Policy.

84. The policy provided to Skyyguard by Defendants identified dwelling limits coverage of $8,200,000.00 in replacement cost coverage.

85. The policy provided to Skyyguard by Defendants did not indicate or identify any limitations on ordinance and law coverage under the Policy.

86. On or about February 18, 2020, in response to Defendants' confusing communications indicating that it could not release a copy of the Policy to Skyyguard, despite Plaintiff's authorization to do so, Plaintiff also emailed Defendants to request an electronic copy of the Policy.

87. Upon information and belief, Defendants did not send Plaintiff a copy of the Policy in response to her request until approximately ten (10) months later.

88. When Defendants finally responded in December 2020, they sent Plaintiff the same 32-page document that they sent to Skyyguard on or about February 12, 2020, with no indication of any limitations on code enforcement coverage.

89. On or about May 19, 2020, Plaintiff's appraiser signed the appraisal award and completed the supporting appraisal estimate as discussed and agreed to with Defendants' appraiser.

90. On or about May 26, 2020, Defendants' appraiser signed the appraisal award, agreeing with Plaintiff's appraiser concerning the amount of loss on the Claim.

91. The appraisal award, supported by the detailed estimate, identified an RCV of $1,011,245.86 and an ACV of $828,576.77 for the Dwelling; an RCV of $382.29 and an ACV of $356.62 for Other Structures; and an RCV of $423,065.14 for Code upgrade coverage.

92. Even excluding the code upgrade coverage, the appraisal determined that Defendants owed covered benefits to Plaintiff under the Policy in an amount ***almost fifty-six times greater*** than Defendants had initially attempted to pay to settle the Claim.

93. The code upgrade award was primarily intended to address repairs that the appraisers knew and agreed Plaintiff would have to undertake to bring the Property into compliance with Denver's Green Building Ordinance that went into effect on November 2, 2018, and was triggered by the need to replace the roof at Plaintiff's Property.

94. The appraisal award also contained a Clarification stating, "Plus work unknowable during the appraisal process that is required by municipal authorities in order to complete awarded work. Only incurred if work is deemed mandatory by local authorities in order to complete the project in a workmanlike manner."

95. Plaintiff's appraiser's services were a significant additional expense that Plaintiff had to incur as a result of Defendants' failure and refusal to conduct a reasonable investigation of the Claim and its failure and refusal to pay covered benefits to Plaintiff without a reasonable basis.

96. Among other items, the appraisal award included a full roof replacement, as was identified by Skyyguard in its March 13, 2019 estimate.

97. The roof replacement accounted for at least $621,769.31 in RCV benefits and $474,163.68 in ACV benefits.

98. Among other items, the appraisal award included $49,368.58 in RCV benefits to repair the HVAC units.

99. Plaintiff and Skyyguard relied on the 32-page policy sent to them by Defendants and the signed, binding appraisal award to begin repairs, including significant code upgrades.

100. On or about June 12, 2020, Defendants purportedly prepared a letter addressed to Plaintiff's appraiser, indicating that Defendants had "completed its factual investigation" of the Claim.

101. The letter is not signed.

102. In the letter, Defendants referenced some information that it had purportedly obtained during its "factual investigation" into the loss concerning the date of loss.

103. Defendants state in the letter that Plaintiff's coverage under the Policy for code enforcement coverage is "limited."

104. In the letter, Defendants identify language that they indicate they were quoting from the Policy.

105. In the letter, Defendants intentionally misrepresent the terms and conditions of the Policy, including setting forth policy provisions in a misleading and inaccurate manner, and intentionally failing and refusing to indicate when they had omitted material terms and conditions related to the code enforcement coverage.

106. Defendants intentionally misrepresented in the letter that the code enforcement coverage has a limit of $100,000.00 for any one occurrence.

107. None of the language cited in Defendants' June 12, 2020 alleged letter was contained in the 32-page "policy" that Defendants sent in response to Plaintiff's and Skyyguard's requests for a copy of the Policy.

108. Neither Plaintiff, nor Mr. Ziegler, ever received the above-referenced letter allegedly dated June 12, 2020.

109. On or about June 15, 2020, Defendants issued a check to Plaintiff for covered benefits in the amount of $801,197.60, stating that it was for the "Actual cash value payment for Church hail damage and damage to another structure due to hail."

110. These benefits were unreasonably delayed as a result of Defendants' failure and refusal to perform a reasonable and complete investigation into the Claim and to pay the benefits due and owing to Plaintiff under the Policy.

111. In or around July 2020, Skyyguard began working to complete the repairs to the Property, including significant work required to comply with code upgrade requirements.

112. The primary code upgrades at issue were to comply with the Green Buildings Ordinance that went into effect in Denver on November 2, 2018 and was triggered by the necessity of the roof replacement at the Property.

113. On or about December 10, 2020, Defendants sent Plaintiff an email with a copy of the 296-page renewal of the Policy for the policy term of January 10, 2020 to January 10, 2023.

114. Among other changes in this policy renewal, Plaintiff's deductible for a windstorm or hail claim increased from $5,000.00 to $100,000.00.

115. Among other changes in this policy renewal, Plaintiff's premium increased.

116. Among other changes in the policy renewal, Defendants added a "Limitations on Coverage for Roof Surfacing."

117. Among other changes in the policy renewal, the Declarations Page in the renewal policy specifically notes that "Cosmetic Damage to Roof Surfacing by Wind and/or Hail is Excluded."

118. Defendants did not provide adequate notice to Plaintiff concerning the changes made with the renewal of its Policy.

119. On or about December 14, 2020, Defendants sent an email to Plaintiff stating, "Attached are the 2018 Multi Peril policy and declaration pages. Please let me know if you have any questions."

120. Again, this email attached the same 32-page document that was previously provided to Skyyguard and which contains no indication of any limitation on code enforcement coverage.

121. On or about December 16, 2020, for the first time during its handling of Plaintiff's Claim, Defendants emailed a copy of the section of the Policy that it misrepresented to Plaintiff stating that there is a $100,000.00 limitation on code upgrade coverage.

122. The excerpt from the Policy provided by Defendants demonstrated that Defendants had intentionally misrepresented the Policy terms and conditions in the letter that it purportedly drafted and sent to Plaintiff on or about June 12, 2020.

123. At a minimum, the reference to a $100,000.00 limitation is ambiguous and can be read so as not to limit code upgrade coverage on Plaintiff's Claim.

124. It was not until on or about December 21, 2020, that Defendants finally provided a complete, certified copy of the Policy to Skyyguard.

125. The copy of the Policy sent to Skyyguard on or about December 21, 2020, is 218 pages.

126. The limitation supposedly relied on by Defendants to limit the code upgrade coverage to $100,000.00 is hidden on page 67 of the 218-page document, and is not referenced anywhere on the Declarations Pages.

127. That same day, Skyyguard responded to Defendants, provided a copy of the Ordinance requiring the significant code upgrades that had been performed, and pointed out that the Policy now being sent was significantly different and more expansive than the 32-page document that was previously sent to Plaintiff and Skyyguard in response to their requests for a copy of the Policy.

128. The following day, Skyyguard pointed out that Defendants were misrepresenting the terms and conditions of the Policy, and demonstrated why the $100,000.00 limit did not apply to the coverage at issue in Plaintiff's Claim.

129. In response, Defendants stated that Plaintiff received a copy of the Policy when it initially purchased it in 2017.

130. Defendants also provided Plaintiff and Skyyguard, for the first time, a copy of the unsigned letter that it purportedly addressed and sent to Plaintiff's appraiser on or about June 12, 2020, and the letter it purportedly sent to Plaintiff on or about June 12, 2020, which identify a $100,000.00 limit to law and ordinance coverage, without citing to any Policy provisions or providing any reasonable basis for this limitation.

131. On or about December 23, 2020, Skyyguard again requested that Defendants release the code upgrade coverage for the portion of the roof replacement that had been completed.

132. Defendants declined to release the code upgrade benefits owed to Plaintiff without a reasonable basis.

133. On or about December 30, 2020, Defendants sent an email to Skyyguard and Plaintiff again purposefully and intentionally misrepresenting the terms and conditions of the Policy, purposefully and intentionally leaving out pertinent terms and conditions, and purposefully

and intentionally failing to indicate when it was omitting material terms and conditions from the Policy language while suggesting that it was quoting directly from the Policy.

134.  On or about February 4, 2021, Skyyguard completed a Supplement Report demonstrating the total cost of the covered repairs to the roof at the Property, updated to reflect the Price List for the timeframe in which the work was completed.

135.  On or about February 8, 2021 Skyyguard sent an email to Defendants to inform them that the work had been completed on the claim and providing Defendants with a copy of, among other items, its Supplement Report. Skyyguard requested that the remaining benefits owed for recoverable depreciated and code and ordinance benefits be paid.

136.  On or about February 25, 2021, Defendants issued payment of additional benefits to Plaintiff in the amount of $292,694.76.

137.  Defendants failed and refused to perform a reasonable and timely investigation of Plaintiff's Claim, and unreasonably delayed and denied the payment of covered benefits owed to Plaintiff.

138.  Defendants' conduct caused Plaintiff to suffer damages.

### FIRST CAUSE OF ACTION AGAINST DEFENDANTS
### (Breach of Contract)

139.  Plaintiff incorporates the other paragraphs of its Complaint as if fully set forth herein.

140.  The Policy creates a contract of insurance.

141.  By their actions through failing and refusing to pay covered benefits owed to Plaintiff under the Policy, Defendants breached the contract of insurance.

142.  By their actions, in failing to act in good faith and fair dealing with their insured, Defendants breached the contract of insurance.

143.  As a direct and proximate result of said breach, Plaintiff is entitled to damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION AGAINST DEFENDANTS
### (Bad Faith Breach of Insurance Contract)

144.  Plaintiff incorporates the other paragraphs of its Complaint as if fully set forth herein

145.  Defendants owed duties to Plaintiff under the Policy's implied covenant of good faith and fair dealing, wherein they covenanted that they would, in good faith, and in the exercise of fair dealing, deal with Plaintiff fairly and honestly, faithfully perform their duties of

representation, and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's right to receive the Policy's benefits.

146.    Defendants acted unreasonably and breached their duties of good faith and fair dealing by their actions, which included, without limitation, the following unreasonable acts:

a. Failing to properly, reasonably, and/or timely investigate and evaluate Plaintiff's claim for Policy benefits;
b. Failing to pay Plaintiff the full benefits owed under the Policy;
c. Failing to pay amounts under the Policy in a timely manner;
d. Failing to effectuate a prompt, fair, and equitable settlement of Plaintiff's claim;
e. Failure to give equal consideration to Plaintiff's rights and interests as they have given their own interests;
f. Depriving Plaintiff of the benefits and protections of the contract of insurance;
g. Compelling Plaintiff to institute litigation in order to recover amounts due under the Policy;
h. Retaliating against Plaintiff for submitting a valid claim under the Policy;
i. Changing the terms and conditions of the Policy at renewal to Plaintiff's detriment, without adequate notice and without a reasonable basis for making said changes; and,
j. Other conduct to be revealed through discovery.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
### (Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116)

147.    Plaintiff incorporates the other paragraphs of its Complaint as if fully set forth herein.

148.    C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

149.    Plaintiff is a first-party claimant under C.R.S. §10-3-1115.

150.    Defendants have delayed payment on Plaintiff's claim without a reasonable basis within the meaning of C.R.S. §10-3-1115.

151.    C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed or denied by an insurer may bring an action in Colorado district court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

152.    Because Defendants' actions, as described above, violate C.R.S. §10-3-1115, Plaintiff brings this claim to recover its reasonable attorneys' fees and court costs and two times the covered benefit, as allowed under C.R.S. §10-3-1116.

WHEREFORE, Plaintiff The Calvary Baptist Church of Denver respectfully requests that judgment be entered in its favor and against Defendants as follows:

      a. For compensatory damages, both economic and non-economic, in amounts to be proved at trial;
      b. For double damages pursuant to statute;
      c. For all prejudgment interest, statutory or moratory, and post-judgment interest allowed by law;
      d. For reasonable attorneys' fees and costs of suit herein; and
      e. For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated this 21st day of May, 2021.

Respectfully submitted,

ROTH MILNE

By:    */s/ Jennifer A. Milne*
       Jennifer A. Milne, #46286
       David M. Roth, #44800

ATTORNEYS FOR PLAINTIFF
THE CALVARY BAPTIST CHURCH OF DENVER

*In accordance with C.R.C.P. 121, §1-26(9), a printable copy of this document with electronic signatures is being maintained by the filing party and will be made available for inspection by other parties or the Court upon request*