IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:21-cv-01723-CNS-MEH

THE CALVARY BAPTIST CHURCH OF DENVER,

     Plaintiff,

v.

CHURCH MUTUAL INSURANCE COMPANY and
CHURCH MUTUAL INSURANCE COMPANY, SI,

     Defendants.

---

# ORDER

---

Before the Court is Plaintiff/Counter-Defendant Calvary Baptist Church of Denver's (Calvary) Motion to Dismiss Church Mutual's Third, Fourth, and Fifth Counterclaims (ECF No. 67). The Court DENIES IN PART and GRANTS IN PART the motion for the following reasons.

## I. FACTS[1]

Defendant/Counter-Plaintiff Church Mutual Insurance Company, S.I. (Church Mutual) issued Policy No. 0035405-02-968733 (the Policy)[2] to Calvary, effective January 10, 2017,

---

[1] For purposes of this motion, the Court accepts as true, and views in the light most favorable to Church Mutual, all factual allegations contained in the Amended Answer, Counterclaims, & Jury Demand (ECF No. 63). *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

[2] When determining whether a complaint is sufficient to state a claim under Rule 12(b)(6), a court generally confines its analysis to the four corners of the complaint; if materials or documents outside of the complaint are presented, and the court does not exclude them, the motion to dismiss must be converted to a motion for summary judgment. *Jackson v. Integra, Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991). However, where an outside document is either (1) incorporated by reference (i.e., attached to the complaint as an exhibit); (2) central to a claim, referred to in the complaint, and undisputedly authentic; or (3) a matter of which a court may take judicial notice, the court may rely on it without need for converting the motion into one for summary judgment. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

through January 10, 2020, to insure Calvary's church buildings and chattels (the Property) located at 6500 E. Girard Ave., Denver, CO 80224 (ECF No. 63 at 28, ¶¶ 1–2).

Among other provisions, the Policy covered "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss" (*id.* at 28, ¶ 5; *see also* ECF No. 67-1 at 41). If some covered loss or damage occurred, the Policy also covered increased construction costs associated with bringing the Property into compliance with applicable ordinance or law (ECF No. 63 at 28, ¶ 6; *see also* ECF No. 67-1 at 51). Further, if Calvary and Church Mutual disagreed on the amount of loss, the Policy allowed either party to demand an appraisal (Appraisal Clause); in such case, each party would "select a competent and impartial appraiser" to independently evaluate the Property and then come to a joint, binding decision (with an umpire, if necessary) on the amount of loss sustained (ECF No. 63 at 30, ¶ 7; *see also* ECF No. 67-1 at 29). Particularly salient here, the Policy was amended by a separate endorsement, entitled "Colorado Changes—Concealment, Misrepresentation or Fraud" (Fraud Clause), which provided that:

> We will not pay for any loss or damage in any case of:
> 1. Concealment or misrepresentation of a material fact; or
> 2. Fraud
>
> Committed by you or any other insured ("insured") at any time and relating to coverage under this policy.

(ECF No. 63 at 32–33, ¶ 8; *see also* ECF No. 67-1 at 24).

On June 18, 2018, a hailstorm damaged the exterior of the Property, including the roof (*see* ECF No. 63 at 33, ¶ 10). On or about September 14, 2018, Calvary contracted with Skyyguard to repair the Property's roof system, and it signed a Communication Authorization permitting

---

Here, Church Mutual refers to the Policy throughout its counterclaims and appears to have intended to attach a certified copy as an exhibit (*see* ECF No. 63 at 28, ¶ 3), but neglected to do so. Calvary did attach a copy to the instant motion, however (*see* ECF No. 67-1). Because both parties have referred to the Policy and its interpretation is central to the matter at hand, the Court will consider it for purposes of this Rule 12(b)(6) determination.

2

Skyyguard to communicate on its behalf with Church Mutual concerning "any and all information pertaining to [the] claim" (*id.* at 33, ¶ 9). And one day earlier, Skyyguard had contacted Steven Ziegler, a licensed public adjuster with Reserve Capital, LLC, to notify him of Calvary's forthcoming claim and to advise that they anticipated needing his services (*id.* at 38, ¶ 43). Calvary then reported the hail damage to Church Mutual on November 8, 2018 (*id.* at 33, ¶ 10).

Between November 2018 and June 2019, subcontractors for Church Mutual investigated Calvary's claim and provided various estimates for repairs to the Property's roof, gutters, HVAC, and mechanical rooftop equipment (ECF No. 63 at 33–34, ¶¶ 12–16; *id.* at 34–35, ¶¶ 18–20). By the end of that investigation, the subcontractors concluded that the replacement cash value of all repairs to the roof system was $31,217.81 (RCV), with an actual cash value after depreciation of $27,735.79 (ACV) (*id.* at 35, ¶ 20). During that period, Church Mutual issued payments totaling $22,735.79 (after application of the Policy's $5,000 deductible) (*id.* at 34, ¶¶ 15–16; *see id.* at 35, ¶ 20).

Meanwhile, on March 13, 2019, New Line Roofing, LLC prepared a quote for Skyyguard that estimated the cost of the roof's full replacement at $734,755.28 (ECF No. 63 at 34, ¶ 17). In turn, Skyyguard contacted Mr. Ziegler around July 2019 to assist with the claim and sent him a copy of New Line Roofing's quote (*id.* at 38, ¶ 44). Skyyguard then referred Mr. Ziegler to Calvary to work on the claim; the decision whether Mr. Ziegler would be retained was ultimately left to Calvary and Mr. Ziegler (*id.* at 38, ¶ 45). Mr. Ziegler then gathered information about the claim and the Property for the purpose of deciding whether to assist Calvary as its public adjuster or appraiser (*id.* at 38, ¶ 48).

On July 17, 2019, Skyyguard and Mr. Ziegler inspected the Property; during the inspection, Mr. Ziegler told Skyyguard that he was "90 percent sure" that Calvary's claim should be covered by insurance (ECF No. 63 at 38, ¶¶ 46–47). Mr. Ziegler allegedly "would not agree to be an appraiser if he did not believe that there was coverage for the loss," and at some point, he testified that "he would not agree to be an appraiser if he did not observe damage to the covered property or believed that the damage was insufficient" (*id.* at 38–39, ¶¶ 49–50). He also testified that "he decides whether to serve as an insured's public adjuster or appraiser based on what he believes is in the insured's best interest" (*id.* at 39, ¶ 51). Allegedly, "Mr. Ziegler recommended that Calvary invoke the appraisal clause and appoint him as Calvary's appraiser," (*id.* at 39, ¶ 52), which Calvary ultimately did in a signed writing on July 23, 2019 (*id.* at 35–36, ¶ 23).

On September 23, 2019, Skyyguard prepared a new estimate of repairs totaling $1,810,944.32 RCV for a full roof replacement (ECF No. 63 at 35, ¶ 22). Three days later, Mr. Ziegler emailed Church Mutual to invoke the Appraisal Clause and attached a copy of Skyyguard's estimate (*id.* at 35–36, ¶ 23). Mr. Ziegler, however, did not provide a copy of the earlier, much lower estimate provided by New Line Roofing (*id.* at 36, ¶ 32). At any rate, Church Mutual acknowledged the demand, named Brett Lochridge of Unified Building Sciences as its appraiser, and requested that Mr. Ziegler exchange disclosures pursuant to Colorado DORA Bulletin No. B-5.26[3] (*id.* at 36, ¶ 25)

---

[3] This Bulletin—of which this Court may take judicial notice and consider for purposes of this Rule 12(b)(6) determination, *see Gee*, 627 F.3d at 1186; *Parker v. Parker*, 82 F.2d 575, 577 (10th Cir. 1936)—provides in relevant part that:

> 1. The appraiser and umpire must disclose to all parties, any other appraiser, and any other umpire, as well as any known facts that a reasonable person would consider likely to affect the impartiality of the appraiser including:
>    a. A financial or personal interest in the outcome of the appraisal; and

4

On November 5, 2019, Mr. Ziegler provided his disclosures to Mr. Lochridge, representing that he had "no financial interest in the outcome of this appraisal" (ECF No. 63 at 36, ¶ 28). Mr. Lochridge allegedly "relied on Mr. Ziegler's disclosures and trusted that Mr. Ziegler was competent and impartial, as required by the Policy" (id. at 36, ¶ 29). But Mr. Ziegler never told Mr. Lochridge that he had already inspected the Property with Skyyguard five months earlier, developed damage opinions, and then recommended that Calvary invoke the Appraisal Clause and appoint him as Calvary's appraiser (*id.* at 40, ¶ 65). Had Mr. Lochridge known this information before or during the appraisal, he allegedly "would not have credited Mr. Ziegler's assessment as he would an impartial appraiser," nor would he have signed the final appraisal award the following year (*id.* at 40, ¶¶ 66–67).

Mr. Ziegler and Mr. Lochridge worked together to reach an agreement as to the amount of the loss, participating in multiple discussions and inspections of the Property (ECF No. 63 at 35–36, ¶¶ 30–31, 35). Finally, on or about May 19, 2020, the appraisers agreed on a total appraisal award of $1,434,693.29 RCV and $828,933.39 ACV (*id.* at 37, ¶ 35). Both appraisers signed the appraisal award, acknowledging that "we have no personal or financial interest in the outcome of this matter in accordance with the department of Regulatory Agencies, Department of Insurance, Bulletin No. B-5.26 and Colorado Uniform Arbitration Act, C.R.S. 13-22-201 et seq." (*id.* at 37, ¶ 37). On or about June 15, 2020, Church Mutual issued payment to Calvary in the amount of $801,197.60, a figure based on the appraisal award's ACV less the prior payments and deductible (*id.* at 38, ¶ 40).

---

b. A current or previous relationship with any of the parties to the agreement to appraise or the appraisal proceeding, their counsel or representatives, a witness, or another appraiser or the umpire.

After the appraisal award issued, Mr. Ziegler sent Calvary a non-itemized invoice charging $75,000 for 250 hours of work performed for the appraisal; in comparison, Mr. Lochridge's final invoice to Church Mutual totaled $12,228.23 (ECF No. 63 at 39, ¶¶ 54–56). Calvary then allegedly paid Mr. Ziegler out of the funds it received from the appraisal award (*id.* at 39, ¶ 57).

Meanwhile, Skyyguard subcontracted with New Line Roofing to replace the Property's roof (ECF No. 63 at 40, ¶ 68). New Line Roofing agreed to furnish all material, labor, and equipment in connection with the project (*id.* at 40, ¶ 69). On February 4, 2021, Skyyguard prepared a supplemental estimate that "redacted the costs from New Line Roofing's invoice for the work completed on the roof" (*id.* at 41, ¶ 72). Four days later, Skyyguard emailed Church Mutual and advised that work had been completed on the Property, attached its supplemental estimate, and requested payment of all recoverable depreciation and ordinance upgrade amounts based on the appraisal award (*id.* at 41, ¶¶ 70–71). Relying on Skyyguard's representations in the supplemental estimate, Church Mutual issued a payment in the amount of $392,694.76 to Calvary on February 25, 2021 (*id.* at 41, ¶ 73).

Later during a deposition, however, a Skyyguard officer "admitted that the estimates he submitted to Church Mutual for payment contained costs for roof replacement line items which were greater than the actual costs being charged for the work" (ECF No. 63 at 41, ¶ 76). The complete cost for New Line Roofing's work—$768,932.30, plus 20% for overhead and profit to Skyyguard as the general contractor—was $922,718.76 (*id.* at 41–42, ¶ 77). But Church Mutual ultimately paid Calvary a total of $1,026,260.87 for this work based on Skyyguard's representations in its supplemental estimate (*id.* at 42, ¶ 78). In other words, Church Mutual paid

6

$103,542.11 more than the total costs actually incurred to replace the roof of the Property (*id.* at 42, ¶ 79).

## II. LEGAL STANDARDS

### A. Fed. R. Civ. P. 12(b)(b)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Based on this standard, dismissal may occur "either because [the claim] asserts a legal theory not cognizable as a matter of law or because the claim fails to allege sufficient facts to support a cognizable legal claim." *Bd. Of Cnty. Comm'rs v. Brown Group Retail, Inc.*, 598 F.Supp.2d 1185, 1191 (D. Colo. 2009).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Plausible" in this context refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the [claimant] 'ha[s] not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "Plausible," however, "does not refer to the likelihood that the allegations can be proven or even that the allegations are true." *Bd. Of Cnty. Commr's*, 598 F.Supp.2d at 1191–92. Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

### B. Insurance Policy Interpretation

"An insurance policy is merely a contract that courts should interpret in line with well-settled principles of contract interpretation." *Cyprus Amax Mineral Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) (citation omitted). In interpreting an insurance policy, a court should avoid rewriting provisions, and should give words their plain and ordinary meaning unless the policy evinces a contrary intent. *Id.* The court should read the provisions of the policy as a whole, not in isolation. *Id.* The court may neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage. *Id.* However, because of the unique nature of insurance contracts and the relationship between the insurer and insured, the court should construe ambiguous provisions against the insurer and in favor of providing coverage to the insured. *Id.*

Furthermore, "[a]n insurance policy and endorsement attached to it must be considered as a single instrument, and they should be construed together in the absence of an internal conflict which cannot be reconciled." *Nat'l Union Fire Ins. Co. v. Fed. Ins. Co.*, 213 F.Supp.3d 1333, 1341 (D. Colo. Sept. 30, 2016) (citation omitted). The endorsement, as the most recent expression of intent, prevails if the language of the two conflicts. *Id.* If an insurance policy has been amended by an endorsement, the court should presume that the endorsement was intended to change its meaning. *Cf. City of Colo. Springs v. Powell*, 156 P.3d 461, 465 (Colo. 2007) (in the context of statutory interpretation).

### III. ANALYSIS

#### A. Third Counterclaim—Breach of Fraud Clause

In its third counterclaim, and as set forth above, Church Mutual alleges that Calvary and its agents breached the Policy's Fraud Clause by having "(i) submitted to the appraisal panel an estimate exceeding the necessary cost and scope of repairs, (ii) concealed Mr. Ziegler's pre-

8

appraisal involvement and his partiality toward Calvary, and (iii) misrepresented or concealed the true cost of the repairs to the Property" (ECF No. 63 at 46, ¶ 109). In seeking to dismiss this counterclaim, Calvary argues that Church Mutual's allegations that Skyyguard and Mr. Ziegler made various misrepresentations "[d]o not plausibly suggest that Calvary itself made any false statements or concealed a material fact with the intent to deceive Church Mutual, which is a necessary element of the claim" (ECF No. 67 at 6; *see id.* at 7–10). Calvary also argues that any "alleged misrepresentations do not relate to 'coverage under the policy' as that phrase is used in Church Mutual's fraud clause" (*id.* at 6; *see id.* at 10–12). The Court addresses each of these arguments in turn.

### 1. Church Mutual's third counterclaim may proceed in the absence of binding authority holding that misrepresentations cannot be imputed to Calvary by its agents, Skyyguard and Mr. Ziegler.

The parties appear to agree that, in order to prevail on a claim for breach of a fraud clause in an insurance policy, the insurer must prove that the insured (1) made a false statement as to a material matter, and (2) with the intent of inducing the insurer to pay more than the amount of the loss sustained (*See* ECF No. 63 at 46, ¶ 112; *see also* ECF No. 67 at 7 (citing *Northwestern Nat. Ins. Co. v. Barnhart*, 713 P.2d 1360, 1361 (Colo. App. 1985)). Based on this standard, Calvary argues that, even assuming as true that Skyyguard and Mr. Ziegler made misrepresentations or concealments in connection with the subject claim, any fraudulent intent on the part of these subcontractors cannot be imputed to Calvary for purposes of evaluating whether *Calvary* intentionally made a false statement as to a material matter (ECF No. 67 at 7–10).

Predictably, the parties disagree on the state of the law in Colorado regarding whether an agent's[4] fraudulent or deceptive intent may be imputed to the principal. Church Mutual cites a number of cases to demonstrate that Colorado law is "settled that an insured may breach the policy through its agent's misrepresentations and concealments" (ECF No. 76 at 5). None of these authorities, however, are particularly availing.

Church Mutual first cites to *Republic Insurance Co. v. Jernigan*, 753 P.2d 229 (Colo. 1988), where the Colorado Supreme Court noted that "the record does not disclose that Gayle S. Jernigan, *through her agent*, Public Adjusters, Inc., intentionally, purposefully, or fraudulently misrepresented the cost of repairs to her dwelling." *Id.* at 231 (emphasis added). But there, the court found that where a husband intentionally set fire to the couple's insured home and made falsehoods (through the couple's public appraiser) to the insurance company, any falsehoods were not imputable to the innocent wife, who took no part in the arson and was unaware of the husband's scheme to commit insurance fraud. *See Jernigan*, 753 P.2d at 231. *Jernigan* never addressed the broad question whether fraudulent intent can be imputed from a third party to an insured.

Second, Church Mutual cites to *American Diver's Supply & Manufacturing Corp. v. Boltz*, 482 F.2d 795 (10th Cir. 1973), where the Tenth Circuit noted that "the record is replete with evidence that *insured's employees and agents* deliberately and intentionally concealed and misrepresented material matters." *Id.* at 798 (emphasis added). But in that case, after a fire at the insured's warehouse, the insured instructed his employees to move any undamaged inventory from the scene of the fire to another warehouse across the street in an attempt to claim that the inventory

---

[4] One's status as an "agent" (or the existence of an agency relationship) is technically a legal designation, not a factual allegation that the Court must accept as true. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012). But in any event, Skyyguard's and Mr. Ziegler's potential statuses as "agents" for Calvary are immaterial for purposes of deciding this question.

had been destroyed in the fire. *Id.* at 795. In other words, the question whether fraudulent intent can be imputed from a third party to an insured was never litigated, because the fraud in that case was committed by employees at the insured's express direction.

Finally,[5] Church Mutual cites to *Reddy v. Essentia Insurance Co.*, No. 1:21-cv-00433-RMR-MEH, 2021 WL 3742243 (D. Colo. Aug. 24, 2021), where a federal magistrate judge found that the insurer had stated a plausible claim for breach of a policy's fraud clause where the misrepresentations at issue were made by the insured's insurance broker. *See id.* at *6. But in that case, the misrepresentations were made by the insured *himself* in a signed application that his broker submitted. *Id.* at *1. In other words, the misrepresentations at issue in that case were not actually "made" by the broker, but merely transmitted. The court was not presented with the question whether the broker's deceptive intent could be imputed to the insured in that case.

On the other hand, Calvary analogizes to *Jehly v. Brown*, 327 P.3d 351 (Colo. App. 2014)—a case involving a fraudulent concealment claim in which the Colorado Court of Appeals held that knowledge of a third-party contractor could not be imputed to a property owner for purposes of evaluating whether the property owner intentionally concealed a material fact. *Id.* at 355. There, the court began by noting the elements of fraudulent concealment:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

---

[5] Briefly, Church Mutual has also cited to *Sunflower Condominium Association v. Owners Insurance Co.*, 802 Fed. App'x 376 (10th Cir. 2020), where the Tenth Circuit was presented with the question whether "the district court err[ed] in instructing the jury to impute fraudulent intent to Sunflower through the conduct of [its independent contractors,] R3NG and Domecq." *Id.* at 382–86. But the Court declined to address the merits, reasoning that Sunflower had waived the instructional issue at trial. *Id.* at 386.

*Id.* at 353. Based on these elements, the court reasoned that, "in the context of fraudulent concealment, a defendant must have an active or conscious belief or awareness that he is concealing a fact," and that "'actual knowledge,' as the term itself connotes, is different from 'imputed' knowledge." *Id.* at 353–54. The court further observed that Colorado had no binding case law in which an agent's knowledge had been imputed to a principal sufficient to meet the actual knowledge element of a fraudulent concealment claim. *Id.* at 354. To the contrary, while the general rule in Colorado is that an agent's notice or knowledge is imputed to the principal, there nevertheless cannot be liability "when [the principal's] actual knowledge or conscious awareness of a fact must be proved as an element of a claim for relief." *Id.* In other words, for a fraudulent concealment claim,

> knowledge of the information by the agent, when not communicated to the principal, is not deemed to be that of the principal. Thus, it follows that a plaintiff cannot rely upon or request imputation of the knowledge of an agent to establish actual knowledge, or conscious awareness, on the part of the principal.

*Id.* at 355.

Calvary's analogy to imputed deceptive intent in the fraudulent concealment context is compelling. Nevertheless, neither party has cited a case directly on point.[6] As this is Calvary's

---

[6] The Court's own research, however, suggests that the weight of out-of-state authority may lean toward the conclusion that the misrepresentations of an insured's agent are imputable to the insured. *See Harold J. Warren, Inc. v. Fed. Mut. Ins. Co.*, 386 F.2d 579, 582 (1st Cir. 1967) ("It is well settled in Massachusetts that an agent's attempt to defraud is attributable to his principal, if the agent is acting within the scope of his authority.") (citations omitted); *Vitale v. Aetna Cas. & Sur. Co.*, 814 F.2d 1242, 1248 (8th Cir. 1987) (explaining that public policy favors holding insureds responsible for their agents' fraudulent conduct because otherwise, "an insured could simply delegate responsibility for submitting the proof of loss to a third party whose conduct could then be disavowed"); *see also Mick v. Royal Exch. Assur.*, 91 A. 102, 105–06 (N.J. 1914) ("[An insured] should not be heard to adopt the agent's acts where they [benefit] him, and disclaim them where they are to his prejudice. It is he, and not the insurance company, who reposes the confidence in the agent; and when that confidence is abused, especially by acts of fraud that if successful will be greatly to his pecuniary advantage at the expense of the company, he that reposes the confidence should pay the penalty."); *Bockser v. Dorchester Mut. Fire Ins. Co.*, 99 N.E.2d 640, 642–43 (Mass.

motion, it bears the burden of demonstrating why dismissal is warranted, and because Calvary cannot cite to any binding authority that a third party's deceptive intent cannot be imputed to an insured as a matter of law, the Court finds that Church Mutual has stated a cognizable claim.

Accordingly, the Court DENIES Calvary's motion to dismiss Church Mutual's third counterclaim to the extent that it is predicated on the theory that deceptive intent cannot be imputed to Calvary on the part of Skyyguard or Mr. Ziegler as a matter of law.

### 2. Church Mutual's third counterclaim may proceed to the extent that it plausibly alleges Calvary's <u>own</u> misrepresentations and concealments.

Separately, Church Mutual argues that it sufficiently pleaded its claim for breach of the Fraud Clause where it alleged that Calvary had *itself* made misrepresentations or concealments in connection with its claim. The Court agrees.

Church Mutual, for instance, alleged that *Calvary* knew of Mr. Ziegler's pre-appraisal involvement with the claim—i.e., that Mr. Ziegler had previously inspected the Property, formed advance opinions about the extent and cost of the hailstorm damage, and recommended that Calvary invoke the Appraisal Clause and appoint him as its appraiser—yet failed to disclose Mr. Ziegler's likely bias to Church Mutual (*see* ECF No. 63 at 38–40, ¶¶ 43–52). Similarly, Church Mutual alleged that *Calvary* knew of Mr. Ziegler's personal, financial stake in the claim—i.e., that it improperly paid Mr. Ziegler's invoice using the funds received from the appraisal award that were meant to cover repairs to the Property—yet failed to disclose this known financial interest to Church Mutual (*see id.* at 39, ¶¶ 54–57; 44, ¶ 96; 48, ¶ 122).

---

1951) (noting a difference of opinion among jurisdictions, but adopting the majority view "that the attempted fraud of the agent acting in the scope of his employment binds the principal").

As such, the Court DENIES Calvary's motion to dismiss Church Mutual's third counterclaim to the extent that it is predicated on the theory that Church Mutual failed to allege Calvary's *own* misrepresentations or concealments regarding its claim.

### 3. Church Mutual's third counterclaim may proceed because Calvary's alleged misrepresentations plausibly "relate to coverage under the policy."

Lastly, Calvary argues that, even assuming as true that Calvary (either itself, or by its agents) made misrepresentations or concealments, none of these statements "plausibly establish a breach of the fraud clause in Calvary's insurance policy because they do not relate to 'coverage' under the policy under the amended language" (ECF No. 67 at 12). Calvary again points out that the Fraud Clause was amended by endorsement to read: "[w]e will not pay for any loss or damage in any case of: (1) concealment or misrepresentation of a material fact; or (2) fraud committed by you or any other insured ("insured") at any time and *relating to coverage under this policy*" (*Id.* at 10; *see also* ECF No. 67-1 at 24) (emphasis added). By contrast, the pre-endorsement version of the clause voided coverage in the event of misrepresentation or fraud concerning "this Coverage Part," "the Covered Property," "your interest in the Covered Property," and "a claim under this Coverage Part" (*Id.* at 10; *see also* ECF No. 67-1 at 29). Given this amended language, Calvary contends that "the fraud clause must be read to apply only to statements about coverage under the policy, not to any and all statements about the property, claims under the property, or Calvary's ownership of the property." (*Id.* at 10–11).

Put simply, this argument runs counter to both the plain language of the Fraud Clause and common sense. The phrase "relating to coverage under this policy" is much broader than the language used in the pre-endorsement version of the Fraud Clause. And here, the Court agrees with Church Mutual that "[t]he terms 'covered property,' 'interest in the covered property,' and 'a

14

claim under this coverage part' are all subjects encompassed within the meaning of 'coverage.' In other words, each of those subjects 'relat[e] to coverage under this policy'" (ECF No. 76 at 8). To adopt Calvary's unduly narrow reading, for instance, would expose Calvary to liability for breach of the Fraud Clause if it materially misrepresented or concealed the contents of the Policy,[7] but *not* where it misrepresented facts about the physical condition of the Property, an incident at the Property giving rise to a claim, or whether Calvary even owned the Property. *See SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F.Supp.2d 1069, 1085 (D. Colo. 2013) ("The Court must construe a contract in a manner that avoids an absurd result[.]").

In sum, the Court DENIES Calvary's motion to dismiss Church Mutual's third counterclaim to the extent that it is predicated on the theory that any of Calvary's alleged misrepresentations or concealments do not "relate to coverage under this policy."

\* \* \*

Based on the foregoing, the Court DENIES Calvary's motion to dismiss Church Mutual's third counterclaim.

### B. Fourth Counterclaim—Unjust Enrichment

In its fourth counterclaim, Church Mutual alleges that it "made payments totaling $1,093,892.36 to Calvary following receipt of the defective Appraisal Award," and that "Calvary accepted the payment and has been unjustly enriched at Church Mutual's expense by acquiring and retaining funds that rightfully belong to Church Mutual" (ECF No. 63 at 48, ¶¶ 125–26). But in the instant motion, Calvary correctly observes that "Church Mutual's unjust enrichment claim is only viable in the event that the [insurance policy] is rendered unenforceable or void due to the

---

[7] Likely difficult to achieve since Church Mutual is the other party and signatory to this Policy.

15

circumstances alleged in its counterclaims" (ECF No. 67 at 13). *See Jorgensen v. Colo. Rural Props.*, LLC, 226 P.3d 1255, 1259 (Colo. App. 2010) ("[A] claim for unjust enrichment may not be asserted if there is a valid contract covering the subject matter of the alleged obligation to pay."). Put more simply, if the Policy remains valid even in the event of the Fraud Clause's breach, an action for unjust enrichment will not lie.

The viability of Church Mutual's unjust enrichment claim, therefore, turns on the effect of the Fraud Clause in the event of its breach. On this point, Church Mutual contends that any breach of the Fraud Clause voids the whole Policy as a matter of law, regardless of whether its language expressly provides that coverage will be voided (ECF No. 76 at 10–12). Calvary counters that the Fraud Clause's language operates as an exclusionary clause that vitiates coverage *only* for the particular claim in which the fraud or misrepresentation occurred—it does not void the policy entirely or withdraw coverage on other unrelated claims (ECF No. 67 at 14–15). The Court agrees with Calvary.

Once more, the Fraud Clause provides that "*[w]e will not pay for any loss or damage* in any case of: (1) concealment or misrepresentation of a material fact; or (2) fraud committed by you or any other insured ("insured") at any time and relating to coverage under this policy" (ECF No. 63 at 32–33, ¶ 8; *see also* ECF No. 67-1 at 24) (emphasis added). The phrase above is not defined by the policy. When faced with an undefined term in the policy, a court must give the term its "plain, ordinary meaning[,] interpreted according to the understanding of the average purchaser of insurance." *Cyprus Amax Minerals Co.*, 74 P.3d at 306 (citation omitted).

Looking to its plain and ordinary meaning, "we will not pay for any loss or damage" is most naturally read to mean that Church Mutual is relieved of its obligation to pay for any part of

16

an "occurrence," "incident," or claim in which Calvary has engaged in misrepresentation or fraud. *See United States v. Ostrom*, 80 Fed App'x 67, 71 (10th Cir. 2003) (construing an identical fraud clause to mean that an insured's falsehoods regarding a claim "forfeit any right to property damage claims in connection with the same incident"); *see also Am. Diver's Supply*, 482 F.2d at 798 ("The penalty for attempted fraud in an insurance case where a fraud clause exists . . . is not simply forfeiture of the excess or inflated recovery amount but the voiding of all actual loss benefits as well."); *Martinez v. Hartford Underwriters Ins. Co.*, No. 1:12-cv-02405-MJW, 2014 WL 2016569, at *2 (D. Colo. May 15, 2014) ("Significantly, violation of a fraud clause voids the entire *claim*, not just the portion it pertains to.").

Because the plain language of the Fraud Clause is unambiguous on its face, this Court need go no further in the interpretive task at hand. *Preserve at the Fort, Ltd. v. Prudential Huntoon Paige Assocs.*, 129 P.3d 1015, 1017 (Colo. App. 2004). But even if the phrase "we will not pay for any loss or damage" were ambiguous—reasonably susceptible of meaning that Calvary's breach of the Fraud Clause either (1) voids the entire Policy,[8] or (2) relieves Church Mutual only of its obligation to pay for the claim in which fraud occurred—the Court construes the ambiguous

---

[8] Church Mutual's related contention—that any breach of a fraud clause in an insurance policy voids the policy *as a matter of law*, regardless of the clause's actual language—is unpersuasive. Church Mutual relies on two cases for this proposition. The first of these, *Sunflower Condo. Ass'n v. Owners Ins. Co.*, No. 1:16-cv-02946-WJM-NYW, 2017 WL 6276460 (D. Colo. Dec. 11, 2017), noted that, "[u]nder Colorado law, an insurance policy is void and the insurer is released from its contractual obligation where there is proof of a false statement by insured as to some material matter made for the purpose and with the intention of deceiving the insurer and inducing it to pay more insurance than the amount of the loss sustained." *Id.* at *9 (citation and internal quotation marks omitted). But this statement—contained in an unpublished order—sought only to set forth the correct standard of proof where an insurance policy contains a fraud clause, holding that the insurer need not prove the elements of common law fraud because the express terms of the fraud clause controlled instead. Meanwhile, the second case Church Mutual cites, *Am. Diver's Supply & Manuf. Corp. v. Boltz*, 482 F.2d 795 (10th Cir. 1973), stands for the exact opposite proposition. That case held that "[t]he penalty for attempted fraud in an insurance case where a fraud clause exists . . . is not simply forfeiture of the excess or inflated recovery amount by the voiding of all actual loss benefits as well." *Id.* at 798. As discussed earlier, this language merely clarified that where an insured commits fraud regarding other portions of a claim arising from the same incident, the insurer is relieved of its obligation to pay any part of *that* claim. It did not, as Church Mutual insists, establish that any breach of a fraud clause voids the entire policy as a matter of law.

term in favor of providing coverage to Calvary. *Cyprus Amax Minerals Co.*, 74 P.3d at 299. If Church Mutual intended that the Fraud Clause operate as policy-voiding provision rather than a mere claim-exclusionary one, it was incumbent upon it to so delineate. And of note, Church Mutual knew how to craft a Fraud Clause with the effect of voiding the Policy upon its breach—its pre-endorsement version of this clause read, "[t]his Coverage part is void in any case of fraud by you relating to it" (ECF No. 67-1 at 29). Insurers seeking to avoid liability "must do so in clear and unequivocal language and must call such limiting conditions to the attention of the insured." *Id.* at 307. Here, the Court finds no such limitation in the Fraud Clause.

In sum, assuming that Calvary has breached the Fraud Clause, by the clause's plain terms, Calvary's breach would not result in the Policy being voided entirely. At most, Calvary would forfeit coverage for any part of its claim relating to the hailstorm on June 18, 2018. Because the Policy would remain in effect even in the event of Calvary's breach of the Fraud Clause—in other words, because an express contract would still exist—Church Mutual's unjust enrichment claim may not proceed. *Jorgensen*, 226 P.3d at 1259.

Accordingly, Calvary's motion to dismiss Church Mutual's fourth counterclaim is GRANTED.

### C. Fifth Counterclaim—Recoupment

In its fifth counterclaim, Church Mutual alleges that because it paid Calvary $1,093,892.36 based on a defective appraisal award, it is "entitled to reimbursement and recoupment of all amounts paid to Calvary for this claim, plus interest on the amounts wrongfully obtained and withheld" (ECF No. 63 at 49, ¶¶ 131–32). Similar to its argument regarding Church Mutual's unjust enrichment claim, Calvary argues that Church Mutual's recoupment claim "likewise fails

because it seeks recoupment of all funds paid out on the claim based on the policy being 'vitiated' rather than just any excess funds paid because of any alleged breach of the fraud clause" (ECF No. 67 at 15). The Court does not read Church Mutual's request so broadly.

In connection with its recoupment claim, Church Mutual has asked this Court to "enter judgment declaring that Church Mutual is entitled to reimbursement and recoupment *of all amounts paid to Plaintiff for its Claim*, including all costs related to attending and defending the appraisal; all amounts incurred in defending this action and bringing its counterclaims; and all accrued, but unpaid, interest" (ECF No. 63 at 50) (emphasis added). So, unlike Church Mutual's unjust enrichment claim—a theory of recovery dependent on the Policy's status as void and unenforceable—the recoupment claim seeks only to recover amounts paid for this particular claim, regardless of whether the Policy remains in effect.[9] Put more simply, while the unjust enrichment claim is not viable under these circumstances, the recoupment claim is.

Separately, the Court notes that in Colorado, recoupment is generally pleaded as an affirmative defense, not an independent claim. *See Rabin v. Fidelity Nat. Prop. & Cas. Ins. Co.*, 863 F.Supp.2d 1107, 1119 (D. Colo. 2012) ("In the absence of a statute providing otherwise, recoupment is purely defensive and not offensive, at least when employed in a court of law.") (citation omitted); *see also GSL Group, Inc. v. Travelers Indem. Co.*, No. 1:18-cv-00746-MSK-SKC, 2021 WL 4245372, at *7 (D. Colo. Sept. 16, 2021) ("What Travelers describes as a claim for 'recoupment' is more appropriately characterized as a direct counterclaim against GSL for

---

[9] Although Church Mutual seeks to recover "all amounts incurred in defending this action and bringing its counterclaims" and "all accrued, but unpaid, interest" as part of its recoupment claim (ECF No. 63 at 50), the Court makes no determination as to whether such fees and costs are recoverable. *But see Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1287 (Colo. 1996) ("As a general rule, in the absence of a statute, court rule, or private contract to the contrary, attorney fees are not recoverable by the prevailing party in either a contract or tort action.").

19

unjust enrichment—that is, that Travelers paid sums to GSL that it was not contractually obligated to pay and that it would be unjust to permit GSL to retain those funds.").

In any event, regardless of whether recoupment is more appropriately pleaded as a counterclaim or an affirmative defense, Church Mutual has raised the issue. "If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated." Fed. R. Civ. P. 8(c)(2). "[I]t makes no difference that [the defendant] may have mistakenly designated [its] counterclaims as defenses," or vice versa. *Reiter v. Cooper*, 507 U.S. 258, 263 (1993).

Accordingly, Calvary's motion to dismiss Church Mutual's fifth counterclaim is DENIED.

## IV. CONCLUSION

Based on the foregoing, the Court DENIES Calvary's motion to dismiss Church Mutual's third and fifth counterclaims and GRANTS the motion to dismiss Church Mutual's fourth counterclaim with prejudice.

DATED this 19th day of April 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge